IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ERNEST CRUMP, JR. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 04-328-SLR |
| ) | |
| STAN TAYLOR, THOMAS CARROLL, ) | |
| CORRECTIONAL MEDICAL SERVICES, ) | |
| DAVID DUNNINGTON, and MICHAEL ) | |
| BRYANT[1], ) | |
| Defendants. ) | |

## STATE DEFENDANTS' MEMORANDUM OF LAW

**A.   STATEMENT OF FACTS**

1.   Plaintiff, a prisoner currently incarcerated at Delaware Correctional Center ("DCC"), Smyrna, Delaware filed a Complaint on May 21, 2004 alleging that his Eighth Amendment Rights had been violated. (Complaint, D.I.2). Plaintiff seeks redress pursuant to 42 U.S.C. § 1983. Prison officials sued as State Defendants for alleged deprivations of his constitutional rights are the Commissioner of Correction, the Warden at the Delaware Correctional Center, and "John Doe" correctional officers. Plaintiff filed an Amended Complaint on July 9, 2004 which identified the names Dunnington and Bryant formerly "John Doe" officers. (Amended Complaint, D.I.7).

2.   The events unfold beginning on August 29, 2002, when Plaintiff escaped from the Morris Community Corrections/ Kent Work Release Center.[2] On that date Plaintiff was

---

[1] Michael Bryan is an employee of the Department of Correction. His name has been misspelled in the caption of plaintiff's complaint.
[2] On February 6, 2003, Ernest A. Crump, Jr. pled guilty to the charge of escape after conviction based on his August 29, 2002 escape from the MCCC.

serving a sentence for which he had been convicted. Plaintiff escaped the facility by following a Department clerk through the employees-only exit. The Morris Community Corrections Escape Apprehension Team ("EA-Team") located Plaintiff in the Dover area at approximately 10:20 p.m. on that same evening. Thereafter, the A-team returned Plaintiff to the MCCC/KWRC. In accordance with department procedure, following Plaintiff's escape, an administrative warrant was executed. Plaintiff was transferred to higher security pending further proceedings.

3. On the following morning Plaintiff was transported to DCC and processed through inmate receiving. During Plaintiff's intake processing, he alleges that "[a]fter . . . being there for several hours, a correctional officer (John Doe #1 n/k/a Dunnington) offered me a plate of institutional breakfast. I declined his offer and asked him to leave me alone, and we exchanged more words." (D.I. 2 and D.I. 7, Statement of Claim).

4. Although Plaintiff does not describe the nature or tone of his conversation with Defendant Dunnington, he contends that after the exchange of words, Dunington told him, without any explanation being offered, to strip down to his underwear. Id. Plaintiff further alleges that Sergeant Michael Bryan (the receiving room Officer in Charge) "made a call and had me transferred to the institutional hospital because apparently Mr. Dunington believed that my previous behavior indicated to him that I may harm myself." Id.

5. Concerned for Plaintiff's safety and security, Sergeant Bryan placed Plaintiff in a stripped cell, one emptied of objects which potentially may be used to harm ones self. See Incident Report 02-4463 attached as Exhibit "A". Sgt. Bryant acted based on Plaintiff's statements made that he "was tired of all this," and he was "going to end it

all." See Exhibit "A". Thereafter, Sgt. Bryan contacted the duty shift commander and informed the shift commander of the concerns regarding Plaintiff's mental and physical well-being. Id. In turn, Sgt. Bryan reports, the Shift Commander advised him that under the circumstances mental health should evaluate Plaintiff. Id.

6. As a result, Sgt. Bryan notified the Security Housing Unit area lieutenant explaining the situation so that SHU could prepare for this inmate's arrival. Id. Afterwards, Plaintiff was escorted to the infirmary to expedite the mental health evaluation process. Id.

7. Upon Plaintiff's arrival at the prison infirmary, the mental health staff referred Plaintiff for an emergency evaluation. See <u>Mental Health Progress Notes dated 8/30/02</u> attached hereto as Exhibit "B". The medical staff determined Plaintiff be placed in a safe cell used for mental health observation. See, <u>Comprehensive Mental Health Evaluation (3 pages)</u> attached hereto as Exhibit "C".

8. Mental Health staff evaluated Plaintiff and noted his complaint stating, "I am tired of living in prison. I don't what I am going to do. Now I am looking at being in prison for a long time." <u>Mental Health Progress Notes dated 8/30/02</u> attached hereto as Exhibit "B". The mental health evaluator observed at the time of the examination that

> "Mr. Crump presented with depressed, anxious, despairing, and irritable mood. He was alert and oriented and his speech was slow, emotional, but coherent. He was agitated, guarded, and defensive. He had minimal eye contact with this writer and kept his head down covered by his hands. He denied hallucinations and did not display psychotic behavior." Id.

9. The mental health evaluator assessed and planned Plaintiff's mental status as follows:

>A: Poor future orientation, poor insight, and poor judgment at this time. He appeared to be emotionally volatile and unstable. Self harm is a possibility based on his presentation.
>P: To consult the psychiatrist on call concerning admission to infirmary. <u>Id.</u>

10. After evaluation and consultation with the mental health staff, Dr. Rho ordered Plaintiff admitted to the infirmary on level II suicide observation. See <u>Physician's Order Sheet</u> attached hereto as Exhibit "D". Dr. Rho, ordered that Plaintiff remain in the suicide observation room without clothing and only a paper gown. Exhibit "B". Medical staff was to monitor Plaintiff while in the infirmary. <u>Id</u>.

11. The mental health staff informed the DCC main control and the shift commander that Plaintiff was being admitted to the infirmary for further observation. See Exhibit "B".

12. Commencing Friday, August 30, 2004, through Monday, September 2, 2004, the medical staff at DCC monitored Plaintiff around the clock as he remained on suicide watch. See <u>C.M.S. Full Suicide Observation Record (9 pages)</u> attached hereto as Exhibit "E". During Plaintiff's confinement in the infirmary, he was provided with the basic necessities, e.g. food and shower. See <u>Logbook Entry</u> attached hereto as Exhibit "F".

13. On September 2, 2004, subsequent to a mental health evaluation, medical staff sent a memorandum to DCC security staff that mental health was discharging Plaintiff from the infirmary as per the physician's orders. See <u>Memorandum Re: Infirmary Discharge to Holman and Cunningham</u> attached hereto as Exhibit "G".

In addition to claims against the Correctional Medical Services, Plaintiff seeks an award of compensatory and punitive damages against prison officials and officers. (Complaint, *passim*).

B.    STANDARD OF REVIEW

In order to analyze a motion to dismiss pursuant to Federal Civil Procedure Rule 12(b) (6), all factual allegations of the Complaint must be accepted as true, and the allegations must be construed in favor of the non-moving party. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir. 1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

C.    **PLAINTIFF FAILED TO EXHAUST ADMINISTRATIVE REMEDIES PURSUANT TO 42 U.S.C. §1997E**.

14.    Defendants contend that dismissal of Plaintiff's claims is appropriate because he has failed to exhaust his administrative remedies. Prisoners are required to exhaust all administrative remedies before initiating a lawsuit pursuant to 42 U.S.C. § 1983. *See* Prison Litigation Reform Act (PLRA), 42 U.S.C. Section 1997e. Indeed, this action is subject to the exhaustion requirements set forth in §1997e (a) which states in pertinent part

> No action will be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

*See also, Booth v. Churner*, 206 F.3d 289, 300 (3d Cir. 2000); *Ahmed v. Sromovski*, 103 F. Supp. 2d 838, 843 (E.D. Pa. 2000) (quoting *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000)).

15.    The PLRA § 1997e exhaustion requirements are twofold. First, a prisoner

complaint must pertain to conditions of his or her confinement. The Third Circuit Court of Appeals, interpreting prison conditions as defined in 18 U.S.C. § 3626(g) (2), refers "to the environment in which prisoners live, the physical conditions of that environment, and the nature of the services provided therein." *Booth*, 206 F.3d at 294. Plaintiff has been incarcerated at the Delaware Correctional Center since the conditions complained of arose.

16.     Secondly, prison officials must establish an administrative procedure to remedy prisoner complaints. The Third Circuit stated in *Jenkins v. Morton,* "[E]xhaustion promotes judicial efficiency in at least two ways. When an agency has the opportunity to correct its own errors, a judicial controversy may well be mooted, or at least piecemeal appeals may be avoided. And, even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration, especially in a complex or technical factual context." 148 F.3d 257, 259 (3d Cir. 1998) (quoting *McCarthy v. Madigan,* 503 U.S. 140, 146 (1992).

17.     The State of Delaware Bureau of Prisons has established an Inmate Grievance Procedure whereby "every inmate will be provided a timely, effective means of having issues brought to the attention of those who can offer administrative remedies before court petitions can be filed."  See State of Delaware Bureau of Prisons Procedure Manual, Procedure Number 4.4, Section II (revised May 15, 1998) attached hereto as Exhibit "H". The procedure establishes a three-step grievance process with two levels of appeal. Id. at § V. In order to exhaust all available administrative remedies, a prisoner must complete all stages of review and participate in the appeals process. Therefore the provisions of § 1997 (e) are applicable to him.

18.     The DCC maintains an inmate grievance process which permits prisoners to seek review of the problems they experience during their incarcerated time. This process is designed to provide review and resolution of prisoner grievances. The inmate grievance procedures are made available to every prisoner in the Departments custody. The inmates are required to file formal grievances and appeals to the Inmate Grievance Chair ("IGC") in addition to informal grievances in order to fully exhaust their administrative remedies.[3] After a written grievance is submitted to the IGC,[4] investigation into the matter will be initiated and informal resolution attempted. If informal resolution is unsuccessful, the inmate grievance resolution committee ("RGC")[5] will convene and a hearing will be held, culminating in a recommendation which is forwarded to the Warden or his designee ("Warden"). If the Warden and the grievant concur with the RGC recommendation, the IGC closes the file and monitors issues of compliance. If the parties do not concur, the matter is referred to the Bureau Grievance Officer ("BGO"), who reviews the file. If the BGO concurs with the Warden's decision and the Bureau Chief of Prisons accepts the BGO recommendation, the IGC closes the file and monitors compliance. Alternatively, the BGO can attempt mediation between the grievant and the Warden or recommend outside review of the matter. See Exhibit "H".

19.     The BOP procedure for inmate grievances also provides for an emergency

---

[3] "All inmates, regardless of physical condition/security status/administrative status, shall be entitled to use the IGP." BOP 4.4 Section V.

[4] The grievance process begins when an inmate files a Form #584 which must be completed within 7 calendar days following the incident and forwarded to the IGC.

[5] The RGC is a committee comprised of institutional security staff, treatment staff, and inmate representatives that hears inmate grievances and makes a recommendation to the Warden/Warden's designee.

grievance. An emergency grievance is defined as "an issue that concerns matters which under regular time limits would subject the inmate to a substantial risk of personal, physical or psychological harm." Id. at § IV. Such emergency grievances are expedited. Its procedure provides in relevant part:

> Issues that concern substantial risk of personal, physical or psychological inmate injury shall be addressed immediately by the Warden/Warden's Designee. A copy of the grievance shall be sent to the Inmate Grievance Chair upon receipt by the Warden/Warden's Designee. And the Warden/Warden's Designee shall respond within one calendar day. Grievant appeals of the Warden/Warden's Designee's decision will be decided by the Bureau Chief of Prisons within one calendar day upon receipt of the emergency appeal. NOTE: If the Warden/Warden's Designee should determine that the grievance does not meet the emergency criteria, the grievance shall be returned to the inmate for processing through the normal IGP process steps.

Id. at section V.

20.     Although Plaintiff affirms that DCC has an inmate grievance procedure, (D.I. 6), he clearly denies ever presenting the facts relating to his complaint in the state prisoner grievance procedure. (D.I.7, part II B.). It is incontrovertible that Plaintiff never grieved the conditions of confinement to the mental observation cell or the medical care he received. Plaintiff does allege that he believed that he was "[n]ot allowed to grieve security transfers and didn't know my rights were violated by such transfer." Id. Essentially, Plaintiff contends that filing a grievance would have been futile. However, futility does not excuse the exhaustion requirements under the PLRA. See *Nyhuis v. Reno*, 204 F.3d at 71. "The PLRA requires an inmate to exhaust all administrative remedies prior to bringing a federal action challenging prison conditions, whether or not they provide the relief the inmate says he or she desires in the federal action." *Id.*

Plaintiff denies that he filed a grievance. Moreover, there is no dispute that Plaintiff was familiar with the inmate grievance procedures.

21.     In the instant case, Plaintiff cannot show that he exhausted available administrative remedies with regard to his allegations of inhumane and unsanitary living conditions. The Plaintiff did not file, as required at the institutional level, a grievance which described the "unhealthy, unsanitary and deplorable" living conditions for which he now complains. Clearly, Plaintiff cannot offer genuine evidence to demonstrate that he exhausted available remedies prior to filing this action. It is therefore "beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. at 45-46.

**D.    COMMISSIONER TAYLOR AND WARDEN CARROLL HAD NO ACTUAL KNOWLEDGE OF AND DISREGARDED AN EXCESSIVE RISK TO INMATE'S HEALTH OR SAFETY.**

22.     The Eighth Amendment deliberate indifference analysis for prison conditions is set forth in *Farmer v. Brennan,* 511 U.S. 825 (1994). In order to state a claim that defendant-prison officials acted with "deliberate indifference" in denying him humane conditions of confinement, Plaintiff must (1) identify with particularity what Commissioner Taylor and Warden Carroll failed to do that constituted deliberate indifference, and (2) establish a close causal relationship between the identified deficiency and his ultimate injury. *See Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989). Plaintiff must show actual knowledge by the official of the existence of a substantial risk of harm and that the official had considered the possibility that the risk could cause serious harm. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 132 (3 Cir. 2001) (quoting *Farmer*, 511 U.S. at 846).

23.     Plaintiff's claim against Commissioner Taylor and Warden Carroll does not demonstrate any personal involvement by either of these prison officials. *Bracey v. Grenoble*, 494 F.2d 566 (3d Cir. 1974). Cleary it is Plaintiff's burden to identify how the State Defendants participated in, directed, or acquiesced to the events of the Plaintiff complaint. *Gay v. Petscok*, 917 F.2d 768, 771 (3d. Cir. 1990). In this case, the Plaintiff fails to meet his burden. He has not identified any involvement by State Defendants Taylor and Carroll. He merely makes general allegations in his statement of claim that "Commissioner Taylor has overall responsibility for the Warden, and the Warden has overall responsibility of all officers at DCC", but does not identify how they allegedly violated any of his constitutional rights.

24.     Also, to the extent that the Plaintiff seeks to hold these Defendants liable based on their supervisory responsibilities, the Doctrine of *Respondeat Superior* is not a basis for liability in an action under 42 U.S.C. §1983. *Sample v. Diecks*, 885 F.2d at 1099. Undeniably, the facts alleged against either Commissioner Taylor or Warden Carroll are insufficient to assess liability merely based on their supervisory roles. *Id.* Plaintiff does not allege in his complaint that either Commissioner Taylor or Warden Carroll had a direct role with his placement in the infirmary on suicide observation for a period of 5 days. Aside from the fact that these two Administrative Defendants have supervisory capacity over Department personnel, Plaintiff offers nothing to demonstrate that they participated in or approved of a risk to his health or safety. *Id*.

25.     Given Plaintiff's silence for nearly two years concerning the alleged condition of the observation cell, dark and with feces smeared about, he cannot now show that Defendants displayed deliberate indifference. Certainly, Plaintiff's complaint nowhere

presents sufficient facts to support a determination that Defendants Taylor or Carroll showed deliberate indifference to any particular harm, or that they acted with indifference to an obvious risk of harm created by Plaintiff's placement in the infirmary on suicide observation. Plaintiff's efforts to impose a supervisor liability claim under the Eighth Amendment are insufficient. *See, e.g., C. H. ex. rel. Z.H. v. Oliva*, 226 F.3d 198, 201-02 (3d. Cir. 2000) (en banc) ("It is, of course, well established that a defendant in a civil rights case cannot be held responsible for a constitutional violation which he or she neither participated in nor approved."). Indeed, in order to establish supervisory liability, any misconduct of the correction officers must be "affirmatively linked" to the actions or inactions of the Administrative Defendants. *Rizzo v. Goode*, 423 U.S. 362, 371 (1976).

E. **SERGEANT BRYAN AND FORMER CORRECTION OFFICER DAVID DUNNINGTON**[6] **HAD NO ACTUAL KNOWLEDGE OF AND DISREGARDED AN EXCESSIVE RISK TO INMATE'S HEALTH OR SAFETY.**

26. Without a doubt, the medical records show that on August 30, 2002, Plaintiff displayed a medical condition diagnosed by a physician which required close observation. See Physician's Order Sheet at Exhibit "D". The medical records demonstrate that the treating physicians and medical staff, based on their professional judgment, recommended and directed the course of treatment for Plaintiff. Interdisciplinary Progress Notes dated 8/30/02 thru 9/3/02 attached hereto as Exhibit "I".

27. To state a claim under the Eighth Amendment for cruel and unusual punishment arising from placement on suicide observation in the RAM Room for 4 days, Plaintiff must demonstrate that the Defendants, prison officers caused unnecessary or wanton pain

---

[6] David Dunnington is no longer employed with the Department of Correction. At all times relevant to the complaint, Mr. Dunnington was a correctional officer assigned as a receiving room officer.

on him. He must show that these officers acted with "deliberate indifference" thus depriving him of "the minimal civilized measure of life's necessities." *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

28.     The record indicates prison officers, reasonably believed that Plaintiff's behavior warranted immediate referral to the prison infirmary to be examined by a physician capable of evaluating his medical needs, including addressing any mental health issues. As Plaintiff states in his complaint, "apparently Mr. Dunington believed that my previous behavior indicated to him that I may harm myself." (Complaint, *passim*).

29.     In fact, the medical records clearly support a possibility that Plaintiff could harm himself.  Indisputably, the prison's physician, not the correction security staff, ordered that Plaintiff be confined in the RAM room on suicide observation. Exhibit "B". In addition, the physician directed that under the circumstances presented, Plaintiff could only be supplied with a paper gown, blanket and mattress. Id. Safe cells typically are devoid of any movable objects which could be detrimental to an individual's safety and well being.

30.     Recognizing the Plaintiff may need immediate medical attention as a result of threats to harm self, Sergeant Bryan conferred with the on duty shift commander before ordering that Plaintiff be escorted to the infirmary. See Incident Report 02-4463 as Exhibit "A".  Clearly, not one of the Defendants' actions demonstrates a sufficiently culpable state of mind from which deliberate indifference may be inferred resulting in the unnecessary and wanton infliction of pain. *Wilson v. Seiter*, 501 U.S. at 294.

31.     Although Plaintiff may not agree with the care that was provided to him by the medical staff, he can not support an Eighth Amendment claim against the prison officials

who recognized the need for medical care, and in fact referred him for medical attention. Plaintiff's complaint does not allege facts that demonstrate the Defendant officers knew and disregarded an excessive risk to inmate health or safety. Without doubt, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he also must draw the inference." *Farmer v. Brennan,* supra.

32.     The medical records indicate that Plaintiff rested quietly on mattress, consumed 100% of meal, and voiced no complaints to the nursing staff during the shifts. See Progress Reports at Exhibit "I". Contrary to Plaintiff's claims, he received personal necessities as permitted for individuals placed on mental observation watch.[7]

F.     **OFFICIAL CAPACITY AND SOVEREIGN IMMUNITY**

33.     A §1983 suit against state officials in their official capacities is treated as a suit against the State. *Hafer v. Melo*, 502 U.S. 21 (1991). Under federal law, the State Defendants in their official capacity is not a "person" for the purposes of 42 U.S.C. §1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Consequently, this Court lacks jurisdiction over the State Defendants in their official capacity as the State Defendants are outside the class of persons subject to liability under 42 U.S.C. § 1983. Therefore, dismissal is appropriate.

34.     Furthermore, State Defendants are entitled to qualified immunity because they acted in good faith, without gross or wanton negligence, in the performance of their discretionary duties. *Vick v. Haller*, 512 A.2d 249 (1986).

---

[7] The C.M.S. Full Suicide Observation Record charts the dates and time that staff provided meals to Mr. Crump. The infirmary log indicates the date and time Mr. Crump received a shower.

35.    To the extent that Plaintiff attempts to hold State Defendants liable in their individual capacities for alleged tortuous acts, the State Tort Claims Act shields these State Defendants.  It is the Plaintiff's burden to prove the absence of one or more of the elements of the immunity.  10 Del. C. §4001.  As the Plaintiff has failed to meet his burden, the complaint should be dismissed.

                            **STATE OF DELAWARE**
                            **DEPARTMENT OF JUSTICE**

                            /s/ Ophelia M. Waters
                            Ophelia M. Waters
                            Deputy Attorney General
                            Carvel State Office Building
                            820 North French Street, 6th fl.
                            Wilmington, DE 19801
                            (302) 577-8400
Dated: September 12 , 2005            ophelia.waters@state.de.us

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2005, I electronically filed *State Defendants' Memorandum of Law* with the Clerk of Court using CM/ECF which will send notification of such filing to the following: Kevin J. Connors, Esquire.  I hereby certify that on September 12, 2005, I have mailed by United States Postal Service, the document to the following non-registered participant: Ernest A. Crump, Jr.; SBI #149221; Delaware Correctional Center; 1181 Paddock Road; Smyrna, DE 19977.

**STATE OF DELAWARE
DEPARTMENT OF JUSTICE**

/s/ Ophelia M. Waters
Ophelia M. Waters, I.D. #3879
Deputy Attorney General
820 North French Street, 6th Floor
Wilmington, Delaware 19801
(302)577-8400
ophelia.waters@state.de.us